**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | |
|---|---|
| **IN RE:**<br>**WALL GROUP INDUSTRIES, INC.**<br>**DEBTOR** | **CHAPTER 11**<br>**CASE NO. 17-80873** |
| **WALL GROUP INDUSTRIES, INC,**<br>**PLAINTIFF,**<br><br>**v.**<br><br>**FFD, LLC and MICHAEL OLANDER, JR.**<br>**DEFENDANTS.** | **Adv. Pro. No.: ______________** |

## VERIFIED COMPLAINT

Plaintiff/Debtor Wall Group Industries, Inc. ("WGI" or the "Plaintiff") complains of Defendants FFD LLC ("FFD") and Michael Olander, Jr. ("Olander") (collectively the "Defendants") and in support shows the Court:

## JURISDICTION AND VENUE

1. This Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 11 U.S.C. § 502(a) and (b) because it relates to the validity of a claim in the Debtor's bankruptcy case.

2. Venue is proper in this District under 28 U.S.C. § 1408 and Fed. R. Bankr. P. 7004(f) because the Debtor's principal assets are in this District and the Defendants are subject to personal jurisdiction in this District.

3. This is a core proceeding under 28 U.S.C. § 157 because it seeks an adjustment of the debtor-creditor relationship, it concerns the allowance or disallowance of claims, and it concerns the determination of the validity and extent of liens.

**PARTIES**

4. Plaintiff Wall Group Industries, Inc is a North Carolina Corporation and is the Debtor in this Chapter 11 Bankruptcy.

5. Defendant FFD LLC is a North Carolina Limited Liability Company with its principal office in Wake County.

6. Defendant Michael Olander, Jr. is a shareholder of WGI who, upon information and belief, owns 25% of WGI.

7. WGI filed this Chapter 11 Bankruptcy on October 5, 2017.

**FACTS**

8. WGI is in the business of commercial construction specializing in custom dry-wall, framing and insulation subcontract work. WGI's clients include the federal and state governments and major museums including the Nasher and Smithsonian.

9. WGI was incorporated in North Carolina in or about January 2012, with Frankie Byrd ("Byrd"), its president and CEO, owning all of WGI's 100,000 shares.

10. In or about March 2015, Byrd discussed the possibility of investing in WGI with Defendant Olander.

11. WGI was at that time the victim of its own success, and the company was suffering severe cash flow issues despite being otherwise profitable.

12. Olander offered to make a substantial line of credit available to WGI in exchange for receiving 25% of the company's shares.

13. In or about June 2015, Byrd entered into an agreement with Olander to sell 25% of his shares in WGI to him (the "Stock Purchase Agreement"). A copy of the Stock Purchase Agreement is attached as **Exhibit "1".**

14. Olander agreed to two things as consideration for this substantial stake in WGI, as set forth in paragraph 2.2 of the Stock Purchase Agreement:

a. Ten Thousand Dollars payable to Byrd; and

b. An unrestricted line of credit for the company in the amount of Eight Hundred Thousand Dollars, with WGI and Byrd named as obligors and Olander agreeing to guarantee the payment of the obligation (the "Line of Credit").

15. The Stock Purchase Agreement does not specify that Olander is required to provide the Line of Credit himself. In fact, Olander's agreement to guarantee the payment of the obligation allows for the possibility of obtaining this Line of Credit from an outside financial institution.

16. Olander represented to Byrd that the credit line could be made available almost immediately.

17. WGI entered into contracts in reliance on Olander's representations about the availability of the $800,000 Line of Credit.

18. WGI began to fall behind on payments when the line was not available, and lost two jobs because of Olander's failure to provide the agreed-upon financing.

19. As a stop-gap, Olander provided $130,000.00 in financing to WGI pending the availability of the Line of Credit.

20. On or about September 11, 2015, Olander was able to obtain an $800,000 Line of Credit from Capital Bank, N.A. ("Capital Bank"). This Line of Credit is referred to as the Capital Bank Line of Credit.

21. On or about September 11, 2015, WGI executed a Promissory Note in favor of Capital Bank N.A. in the principal amount of $800,00.00. A copy of the Promissory Note is attached as **Exhibit "2".**

22. On or about September 11, 2015, Byrd executed a guarantee of the Line of Credit. A copy of the Byrd guarantee is attached as **Exhibit "3".**

23. At the time WGI entered into the agreement for the Capital Bank Line of Credit, WGI also executed a Commercial Security Agreement (the "CSA"). CSA is attached as **Exhibit "4".**

24. The CSA gave Capital Bank a lien on substantially all of WGI's assets, including accounts receivable. Capital Bank filed a UCC perfecting its security interest (the "UCC"). A copy of the UCC is attached as **Exhibit "5".**

25. As he had agreed when he received a 25% interest in WGI, Olander guaranteed the Capital Bank Line of Credit as well.

26. With the consent of WGI, Olander was repaid the $130,000.00 that he had advanced from the Line of Credit on or about September 11, 2015.

27. In addition to arranging the Line of Credit, Olander offered to provide "back-office" functions to WGI, offering bookkeeping services.

28. Although there was a "handshake" agreement that Olander would provide these services, and Olander had authority to pay accounts payable as they came due, there was no

agreement that Olander could make payments outside the ordinary course of business, and no authorization for him to disburse company funds to himself.

29. During this period when Olander had control of the WGI books and accounts, there are records of a large amount of transfers to Olander that were made without the authorization of either Byrd or WGI. According to WGI's records, Olander diverted $457,594.49 in WGI funds to himself:

a. On or about January 23, 2017 Olander wired or caused to be wired $42,000.00 from WGI to himself;

b. On or about January 23, 2017 Olander wired or caused to be wired $50,000.00 from WGI to himself;

c. On or about October 12, 2016 Olander wired or caused to be wired $2,200.00 from WGI to himself;

d. On or about October 12, 2016 Olander wired or caused to be wired $200.00 from WGI to himself;

e. On or about October 12, 2016 Olander wired or caused to be wired $99,000 from WGI to himself;

f. On or about October 3, 2016 Olander wired or caused to be wired $1,905.38 from WGI to himself;

g. On or about July 19, 2016 Olander wired or caused to be wired $2,500.00 from WGI to himself;

h. On or about July 8, 2016 Olander wired or caused to be wired $31,000.00 from WGI to himself;

i. On or about June 23, 2016 Olander wired or caused to be wired $1,800.00 from WGI to himself;

j. On or about June 23, 2016 Olander wired or caused to be wired $2,000.00 from WGI to himself;

k. On or about June 13, 2016 Olander wired or caused to be wired $20,000.00 from WGI to himself;

l. On or about June 10, 2016 Olander wired or caused to be wired $55,000.00 from WGI to himself;

m. On or about May 26, 2016 Olander wired or caused to be wired $11,500.00 from WGI to himself;

n. On or about May 9, 2016 Olander wired or caused to be wired $45,000.00 from WGI to himself;

o. On or about May 6, 2016 Olander wired or caused to be wired $46,100.00 from WGI to himself;

p. On or about May 3, 2016 Olander wired or caused to be wired $27,000.00 from WGI to himself;

q. On or about April 8, 2016 Olander wired or caused to be wired $1,739.52 from WGI to himself;

r. On or about April 4, 2016 Olander wired or caused to be wired $6,650.00 from WGI to himself;

s. On or about March 2, 2016 Olander wired or caused to be wired $12,000.00 from WGI to himself.

30. In addition, without the authorization of either Byrd or WGI, Olander diverted $75,000.00 in WGI funds to MDO Management Group LLC ("MDO"), a company that he is, upon information and belief, the sole member of:

a. On or about August 9, 2016 Olander wired or caused to be wired $5,000 from WGI to MDO;

b. On or about September 11, 2015 Olander wired or caused to be wired $70,000.00 from WGI to MDO.

31. During this period of time, Olander also, without Byrd's knowledge or consent and without the consent of WGI, commingled his own funds with that of WGI, ostensibly to make payments on the Capital Bank Line of Credit.

32. Despite the lack of promissory notes or other documentation, Olander has asserted that the commingled funds constitute "loans" from Olander and MDO to WGI.

33. Without documenting the amount of the purported "loans," Olander convinced Byrd to sign a second shareholder agreement in January of 2017 in which the company gave Olander an additional 10% in equity in exchange for these purported "loans," and Olander's cooperation in obtaining credit beyond the $800,000 Line of Credit. A copy of this agreement is attached as **Exhibit "6".**

34. During the time Olander managed the back-office functions of WGI, the Line of Credit was never fully drawn.

35. In the months after the unauthorized withdrawals, Olander entered into a series of additional purported loan transactions, pressuring WGI to borrow from him at inflated interest rates rather than draw down its Line of Credit.

36. Upon information and belief, during the time Olander managed the back-office functions of WGI, despite hundreds of thousands of dollars being available on the Line of Credit he had arranged for the company, WGI fell behind on multiple obligations, including the payment of payroll trust fund taxes.

37. During this time, despite the frequent requests of CEO Byrd, Olander began to cut off WGI's access to its own financial records.

38. Olander and his companies still have possession of key documents necessary for the administration of this bankruptcy, and to date they have not been provided.

39. In or about July of 2017 FFD, LLC ("FFD") was formed. Its principal office address of 135 E. Martin Street, Suite 201, Raleigh, NC 27601 is also the address of several companies owned by Olander, and Olander's counsel has represented that Olander is the owner of FFD. A copy of the Articles of Organization for FFD is attached as **Exhibit "7".**

40. Upon information and belief, Olander is both member and manager of FFD.

41. On or about July 31, 2017, Olander, through FFD, purchased the Capital Bank Line of Credit from Capital Bank. A copy of an allonge documenting the transaction is attached as **Exhibit "8".**

42. In addition, Capital Bank purportedly assigned its security interest to Olander though FFD. Copies of the assignments of the UCC is attached as **Exhibit "9".**

43. On or about September 6, 2017, FFD sent a demand to WGI and Byrd (but, not surprisingly, no demand was made on Olander), claiming that the amount owed to it equals $586,193.94.

44. Upon information and belief, as part of the transaction between Capital Bank and FFD, Olander negotiated satisfaction of the guarantee obligations that served as consideration for his acquisition of a 25% interest in WGI.

45. Because Olander was a guarantor on the Capital Bank Line of Credit, he was personally obligated to satisfy that Line of Credit for the benefit of WGI.

46. Likewise, WGI was obligated to satisfy the Line of Credit, and in exchange for receiving his interest in WGI, Olander agreed to ensure that WGI met its obligation to Capital Bank.

47. By attempting to structure the transaction between Capital Bank and Olander (through FFD) as a note purchase and assignment of security interest rather than what it really was – namely satisfaction of the Line of Credit requiring cancellation of the UCC – Olander is attempting to improperly benefit from the note he had agreed to guarantee.

48. Olander, through counsel for FFD, attempted to divert WGI's accounts receivable to himself by sending letters to WGI's creditors asserting that the UCCs gave him a right to collect these funds.

49. On or about October 2, 2017 FFD sent letters to Davidson and Jones Construction Company, Duke University, Gilbane Building Company, Gilbane/Grunley Joint Venture, Grunley Construction Company, Inc., the State of North Carolina, and Wolk360 Architecture, PLLC. Copies of those letters are attached as **Exhibit "10".**

## FIRST CLAIM FOR RELIEF
**(Equitable Subordination 11 U.S.C. §§ 105(a) and 510(c) & Alter Ego Liability)**

50. Plaintiff incorporates all previous paragraphs by reference.

51. Pursuant to 11 U.S.C. § 510(c), this Court has the power under the principles of equitable subordination to subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest or to order that any lien securing such a subordinated claim be transferred to the estate.

52. Both Olander and FFD engaged in inequitable conduct when they purchased the Capital Bank Line of Credit and simultaneously eliminated Olander's personal guarantee.

53. Olander and FFD attempted to use the payment of a guaranty obligation as a way to attempt to obtain security interests that allowed FFD to attempt to collect WGI's accounts receivable.

54. The misconduct of shareholder Olander and FFD injured the Debtor and the other creditors of WGI.

55. Invocation of equitable subordination is not inconsistent with provisions of Bankruptcy Code.

56. Upon information and belief, FFD was set up for the purpose of satisfying Olander's guaranty obligations.

57. Upon information and belief there was such unity between Olander and FFD that the separateness of FFD ceased. Olander's control over FFD was pervasive such that FFD operated as a mere instrumentality of Olander for Olander's primary benefit to the detriment of the Debtor's creditors.

58. Accordingly, Plaintiff seeks entry of an order piercing the corporate veil of FFD, substituting Olander for FFD.

59. In addition, the Plaintiff asks that the Court order that the UCC be transferred to the estate and cancelled of record.

60. In addition, the Plaintiff asks that the Court subordinate the FFD Debt to all other debts of WGI and grant it either the priority of a loan from an equity holder of WGI or a capital contribution from an equity holder of WGI.

**SECOND CLAIM FOR RELIEF**
**(Recharacterization)**

61. Plaintiffs incorporate all previous paragraphs by reference.

62. Recharacterization is within the broad powers afforded bankruptcy courts. *In re Dornier Aviation*, 453 F.3d 225 (2006).

63. Under the Bankruptcy Code, contributions to capital receive a lower priority than loans because "their nature is that of a fund contributed to meet the obligations of a business and which should be repaid only after all other obligations have been satisfied." *In Re: Province Grande Olde Liberty, LLC*, 655 F. App'x 971, 974 (4th Cir. 2016).

64. The bankruptcy court's broad recharacterization power is "integral to the consistent application of the Bankruptcy Code." *Dornier*, 453 F.3d at 233. "A bankruptcy court's equitable powers have long included the ability to look beyond form to substance." *Id.* at 233. The recharacterization decision itself rests on the "substance of the transaction" involved. *Id.* at 232 (emphasis in original).

65. In this case, Olander is the holder of 25% of the equity of WGI.

66. Olander received that 25% stake in exchange for an investment of $800,000.00. That investment was accomplished by (a.) facilitating the acquisition of an $800,000.00 credit facility and (b.) guarantying that line of credit.

67. Olander negotiated the purchase of the Capital Bank Line of Credit, and thus payment of his guaranty obligation, upon information and belief, at less than its face value.

68. This satisfaction of the guaranty obligation through a note purchase is the true transaction here.

69. By paying whatever he did to satisfy the guaranty obligation, Olander was simply meeting the terms of his Stock Purchase Agreement.

70. As a result, his cash infusion should be treated one of two ways: (a) either as satisfaction of the consideration Olander had agreed to pay to receive his 25% stake in WGI; or (b) as an additional capital contribution by a shareholder, giving him additional ownership in WGI.

71. Instead, through the purported purchase of the Capital Bank Line of Credit by FFD, Olander was able to pursue WGI's accounts receivable for his own benefit.

72. The Court should look through the superficial transaction to what it truly was – an infusion of capital into the Debtor that allowed the Debtor to satisfy its obligation to Capital Bank.

73. The Court should recharacterize the satisfaction of Olander's guaranty and purported purchase of the Capital Bank Line of Credit as what it really is – an infusion of equity into the Debtor that permitted the Debtor to satisfy its obligations to Capital Bank.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract)**

74. Plaintiff incorporates all previous paragraphs by reference.

75. The Stock Purchase Agreement constitutes a valid agreement between Olander, WGI and Byrd.

76. Under the terms of the Stock Purchase Agreement, Olander was required to (a) facilitate the acquisition of an $800,000.00 credit facility and (b) guarantee that Line of Credit.

77. Olander met his obligation by facilitating the procurement of the Capital Bank Line of Credit and guarantying that Line of Credit.

78. Olander breached the Stock Purchase Agreement by using a shell company, FFD, to purchase the Line of Credit, and using that purchase to attempt to divert those funds to himself.

79. Olander breached the Stock Purchase Agreement by satisfying or otherwise eliminating his guaranty of the Line of Credit while the Line of Credit was being collected upon.

**80.** WGI has been harmed by Olander's breach of the Stock Purchase Agreement and is entitled to damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
**(Conversion)**

81. Plaintiff incorporates all previous paragraphs by reference.

82. At all times relevant to this lawsuit WGI was the lawful owner of the funds in its bank accounts and was entitled to their immediate possession.

83. Olander and his agents and/or employees had actual knowledge that they had no right or authority to pay funds from those accounts to Olander or to MDO.

84. Nonetheless, Olander and his agents and/or employees exercised ownership of funds in WGI's bank accounts and diverted those funds to Olander without the consent of WGI.

85. Olander is directly or vicariously liable for the actions of his agents and/or employees.

86. The Debtor was damaged as a direct and proximate result of the actions of the Olander, his agents and/or employees in an amount to be proved at trial.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**(Injunctive Relief)**

85. Plaintiff incorporates all previous paragraphs by reference.

86. Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

87. Relief under section 105 of the Bankruptcy Code is particularly appropriate in a Chapter 11 case when necessary to preserve the property of the debtor's estate and protect a debtor's ability to effectively confirm a restructuring plan.

88. For the reasons set forth in this Complaint, this Court should apply section 105 of the Bankruptcy Code to enjoin any efforts by FFD to enforce its improper security interests to procure adequate protection payments from WGI. Improper payments to shareholder Olander through FFD, procured through a security agreement that the Debtor claims is invalid, threatens to upend the Bankruptcy Code's priority scheme.

89. The actions of Olander and FFD in attempting to enforce their invalid security agreements against funds held by the clients of WGI and divert WGI's accounts receivable to Olander are the reason that WGI was forced to file this Chapter 11 bankruptcy.

90. If FFD and Olander's enforcement of their purported security interest is not enjoined, the Debtor will likely suffer harm and its restructuring efforts will be threatened, since Olander will be paid before the confirmation of a plan in a way that is counter to the Code's priority scheme.

91. The injunctive relief sought by the Debtor is necessary and proper to allow the Debtor to restructure and maintain the status quo until proper treatment of FFD and Olander is determined by the Court.

92. The injunctive relief requested herein will serve the public interest by furthering the Debtor's efforts to restructure successfully.

93. Plaintiff has no adequate remedy at law. Enforcement of these UCCs would divert funds meant for the operation of WGI to a shareholder and upend the priority scheme in bankruptcy. Diverting this purported cash collateral would deprive WGI of operating capital.

94. Based on the foregoing, Plaintiff is likely to succeed on the merits of its claims.

95. The Plaintiff seeks an injunction enjoining any effort by Defendants to enforce the FFD UCC under section 105(a) of the Bankruptcy Code until the Court has decided the issues raised in this Complaint.

WHEREFORE, Plaintiff asks that the Court:

1. Enter an injunction preventing FFD from enforcing its purported security interests and UCC filing or receiving adequate protection payments from the Debtor;
2. Enter an Order piercing the corporate veil of FFD, substituting Olander for FFD;
3. Subordinate the FFD Debt to all other debts of WGI and grant it the priority of a loan of an equity holder of WGI.
4. Recharacterize the FFD Debt as an equity infusion into the Debtor by Olander;
5. Award Plaintiff the costs of this action and its reasonable attorneys' fees as allowed by statute; and

6. For such other relief as the Court deems just and proper.

Dated: October 20, 2017

PARRY TYNDALL WHITE

s/ James C. White
James C. White, N.C. Bar # 31859
Michelle M. Walker, N.C. Bar # 41664
100 Europa Drive, Suite 401
Chapel Hill, NC 27517
jwhite@ptwfirm.com
(919) 246-4676
(919) 246-9113 fax

*Attorneys for Debtor-in-Possession*

## VERIFICATION

I, Frankie Byrd, president of Wall Group Industries, Inc., verify, based on reasonable inquiry, that the factual statements in the foregoing **Verified Complaint** are true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 10/20/17

Frankie Byrd

**EXHIBIT "1"**

# Stock Purchase Agreement
# Wall Group Industries, Inc.

This Stock Purchase Agreement (hereinafter referred to as "Agreement") is made as of ___ day of June, 2015, by and between, as party of the first part, MICHAEL OLANDER, JR., an individual resident of Raleigh, North Carolina (hereinafter referred to as the "Buyer"), and as the parties of the second part, (1) FRANK LEE BYRD, an individual resident of Raleigh, North Carolina (hereinafter referred to as "Seller"), and WALL GROUP INDUSTRIES, INC., a North Carolina corporation (hereinafter referred to as “Company”).

## RECITALS

1. Company is in the business of commercial construction specializing in dry-wall, framing, and insulation subcontract work, with existing and past contracts with the federal government, state government, museums, and large residential apartment projects;

2. Company is currently in a stage of expansion and is in need of capital liquidity to fund its upcoming jobs;

3. Company has One Hundred Thousand (100,000) issued and outstanding common shares all of one class (hereinafter referred to as “Shares”);

4. Seller is the current beneficial owner of one hundred percent (100%) of the Shares of the capital stock in the Company.

5. Seller desires to sell, and Buyer desires to purchase, twenty-five percent (25%) of the Shares of Company, for the consideration and on the terms set forth in this Agreement (hereinafter referred to as the “Purchased Shares”).

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

**1. DEFINITIONS.**

1.1 **"Closing"**--as defined in Section 2.3.

1.2 **"Closing Date"**--the date and time as of which the Closing actually takes place.

1.3 **"Encumbrance"**--any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

1.4 **"Organizational Documents"**--(a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

1.5. **"Proceeding"**--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

**2. SALE AND TRANSFER OF SHARES; CLOSING.**

**2.1 SHARES.**

Subject to the terms and conditions of this Agreement, at the Closing, scheduled for June 22, 2015, Seller will sell and transfer the Purchased Shares (representing twenty-five percent of the Shares) to Buyer, and Buyer will purchase the Shares from Seller.

**2.2 PURCHASE PRICE.**

The purchase price (hereinafter referred to as the "Purchase Price") for the Purchased Shares will be:

(a) TEN THOUSAND DOLLARS ($10,000.00); and

(b) Obtain an unrestricted line of credit for the Company in an amount of no less than EIGHT HUNDRED THOUSAND DOLLARS ($800,000.00) by the Closing Date (hereinafter referred to as “Line of Credit”). Such Line of Credit will name Seller and Company as the primary obligors, with Buyer as the secondary obligor.

**2.3 CLOSING.**

The purchase and sale (hereinafter referred to as the "Closing") provided for in this Agreement will take place at the offices of Seller's counsel at 2501 Blue Ridge Road, Suite 250, Raleigh, NC 27607, at 10:00 a.m. (local time) on June 22, 2015, or at such other time and place as the parties may mutually agree. Subject to the provisions of Section 7, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.3 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

**2.4 CLOSING OBLIGATIONS**

At the Closing:

(a) Seller will deliver to Buyer:

(i) Certificates representing the Purchased Shares, duly endorsed (or accompanied by duly executed stock powers);

(b) Buyer will deliver to Seller:

(i) TEN THOUSAND DOLLARS (USD$10,000.00) by bank cashier's or certified check payable to the order of Seller;

(ii) Documents sufficient to verify the existence of the Line of Credit and its availability for immediate use by the Company;

**3. REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Buyer as follows:

**3.1 ORGANIZATION AND GOOD STANDING.**

(a) The Company is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under this Agreement.

(b) Seller has delivered to Buyer copies of the Organizational Documents of the Company, as currently in effect.

**3.2 AUTHORITY; NO CONFLICT.**

(a) This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms. Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and to perform their obligations under this Agreement.

(b) Neither the execution and delivery of this Agreement nor the consummation or performance of this Agreement will, directly or indirectly (with or without notice or lapse of time):

(i) contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of the Company, or (B) any resolution adopted by the board of directors or the stockholders of the Company;

(ii) contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge this Agreement or to exercise any remedy or obtain any relief under, any legal requirement or any order to which the Company or either Seller, or any of the assets owned or used by the Company, may be subject;

(iii) contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any governmental authorization that is held by the Company or that otherwise relates to the business of, or any of the assets owned or used by, the Company;

(iv) cause Buyer or the Company to become subject to, or to become liable for the payment of, any Tax;

(v) cause any of the assets owned by the Company to be reassessed or revalued by any taxing authority or other governmental body;

(vi) contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any applicable contract; or

(vii) result in the imposition or creation of any encumbrance upon or with respect to any of the assets owned or used by the Company.

Seller and Company will not be required to give any notice to or obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of this Agreement.

**3.3 CAPITALIZATION**

The authorized equity securities of the Company consist of ONE HUNDRED THOUSAND (100,000) shares of common stock, no par value per share, of which ONE HUNDRED THOUSAND (100,000) shares are issued and outstanding and constitute the Shares. Seller is and will be on the Closing Date the record and beneficial owner and holder of the Purchased Shares, free and clear of all Encumbrances, with Seller owning ONE HUNDRED THOUSAND (100,000) SHARES. With the exception of the Shares (which are owned by Seller), all of the outstanding equity securities and other securities of the Company are owned of record and beneficially by the Company, free and clear of all Encumbrances. No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Company. All of the outstanding equity securities of the Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Company. None of the outstanding equity securities or other securities of the Company was issued in violation of the Securities Act or any other legal requirement. No Company owns, or has any contract to acquire, any equity securities or other securities of any person (other than Company) or any direct or indirect equity or ownership interest in any other business.

**3.4 BROKERS OR FINDERS**

Seller and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

**4. REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as follows:

**4.1 AUTHORITY; NO CONFLICT**

(a) This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the documents evidencing the existence and availability to the Company of the Line of Credit (hereinafter referred to as the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents.

(b) Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of this Agreement by Buyer will give any person the right to prevent, delay, or otherwise interfere with this Agreement pursuant to:

(i) any provision of Buyer's Organizational Documents;

(ii) any resolution adopted by the board of directors or the stockholders of Buyer;

(iii) any legal requirement or order to which Buyer may be subject; or

(iv) any contract to which Buyer is a party or by which Buyer may be bound.

Buyer is not and will not be required to obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of this Agreement.

**4.2 INVESTMENT INTENT**

Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

**4.3 CERTAIN PROCEEDINGS**

There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement. To Buyer's knowledge, no such proceeding has been threatened.

**4.4 BROKERS OR FINDERS**

Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

**5. CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE**

Buyer's obligation to purchase the Purchased Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

**5.1 ACCURACY OF REPRESENTATIONS**

All of Seller' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

**5.2 SELLER' PERFORMANCE**

(a) All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b) Each document required to be delivered pursuant to Section 2.4 must have been delivered.

**6. CONDITIONS PRECEDENT TO SELLER' OBLIGATION TO CLOSE**

Seller's obligation to sell the Purchased Shares and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

**6.1 ACCURACY OF REPRESENTATIONS**

All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

**6.2 BUYER'S PERFORMANCE**

(a) All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b) Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.4 and must have made the cash payments and obtained the Line of Creditor as required pursuant to Sections 2.4.

## 7. TERMINATION

### 7.1 TERMINATION EVENTS

This Agreement may, by notice given prior to or at the Closing, be terminated:

(a) by either Buyer or Seller if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

(b) (i) by Buyer if any of the conditions in Section 5 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Seller, if any of the conditions in Section 6 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date;

(c) by mutual consent of Buyer and Seller; or

(d) by either Buyer or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before June 22, 2015, or such later date as the parties may mutually agree upon.

### 7.2 EFFECT OF TERMINATION

Each party's right of termination under Section 7.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.

## 8. GENERAL PROVISIONS

### 8.1 EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement, including all fees and expenses of agents, representatives, counsel, and accountants.

### 8.2 NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may

designate by notice to the other parties):

**Seller:**

Attention: Gregory S. Connor
Connor Law Group, PLLC
2501 Blue Ridge Road, Suite 250
Raleigh, North Carolina 27607

Facsimile No.: 919-237-9221

**Buyer:**

Attention: ________________________________

Facsimile No.: _______________

with a copy to: _______________

Attention: _______________

Facsimile No.: _______________

**8.3 JURISDICTION; SERVICE OF PROCESS.**

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of North Carolina, County of Wake, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of North Carolina, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

**8.4 FURTHER ASSURANCES**

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

**8.5 WAIVER**

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

**8.6 ENTIRE AGREEMENT AND MODIFICATION**

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

**8.7 ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS**

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

**8.8 SEVERABILITY**

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**8.9 SECTION HEADINGS, CONSTRUCTION**

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

**8.10 TIME OF ESSENCE**

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**8.11 GOVERNING LAW**

This Agreement will be governed by the laws of the State of North Carolina without regard to conflicts of laws principles.

**8.12 COUNTERPARTS**

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**Buyer:**

By:______________________________
MICHAEL OLANDER, JR.

**Seller:**

By: ______________________________
FRANK LEE BYRD

**Company:**

By: ___________________________
FRANK LEE BYRD, President

NORTH CAROLINA
WAKE COUNTY

I, ______________________________, a Notary Public for said County and State, do certify that **Michael Olander, Jr.**, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the _________ day of June, 2015.

(Official Seal)

______________________________________
Notary Public

My commission expires:___________________

NORTH CAROLINA
WAKE COUNTY

I, ______________________________, a Notary Public for said County and State, do certify that **Frank Lee Byrd**, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the _________ day of June, 2015.

(Official Seal)

______________________________________
Notary Public

My commission expires:___________________

NORTH CAROLINA
WAKE COUNTY

I, ______________________________, a Notary Public for said County and State, do certify that **Frank Lee Byrd**, President of Wall Group Industries, Inc., personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the _________ day of June, 2015.

(Official Seal)

______________________________________
Notary Public

My commission expires:____________________

**EXHIBIT "2"**

*0007272744501%0955%09112015%WAU3960*

# PROMISSORY NOTE

ORIGINAL

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $800,000.00 | 09-11-2015 | 10-05-2016 | 7272744501 | 39 | WAU3960 | 34148 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** WALL GROUP INDUSTRIES, INC.
135 EAST MARTIN STREET, SUITE 135
RALEIGH, NC 27601

**Lender:** CAPITAL BANK, N.A.
RALEIGH COMMERCIAL
333 FAYETTEVILLE ST
SUITE 700
RALEIGH, NC 27601

**Principal Amount: $800,000.00** **Date of Note: September 11, 2015**

**PROMISE TO PAY.** WALL GROUP INDUSTRIES, INC. ("Borrower") promises to pay to CAPITAL BANK, N.A. ("Lender"), or order, in lawful money of the United States of America, the principal amount of Eight Hundred Thousand & 00/100 Dollars ($800,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on October 5, 2016. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning October 5, 2015, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the One Month LIBOR Rate as published in the Wall Street Journal. If more than one "One Month LIBOR" is so published, the highest "One Month LIBOR" will be used (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each 1st day of the calendar month following the most recent change. If the 1st day of the calendar month falls on a weekend or a holiday, the interest rate will be calculated using the Index published on the immediately preceding business day. Subsequent to the determination of the initial interest rate (which is rounded to three decimal places), monthly interest rate changes will be calculated to five decimal places. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 0.203% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.600 percentage points over the Index, resulting in an initial rate of 2.803% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

CAPITAL BANK, N.A.
ATTN: PAYMENT DEPT
P O BOX 164405
MIAMI, FL 33116-4405

All payments must be received by Lender consistent with any written payment instructions provided by Lender. If a payment is made consistent with Lender's payment instructions but received after 5:00 PM Eastern Standard Time on a business day, Lender will credit Borrower's payment on the next business day.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: CAPITAL BANK, N.A., PAYMENTS, P O BOX 164405 MIAMI, FL 33116-4405.**

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged **4.000% of the regularly scheduled payment.** This late charge shall be paid to Lender by Borrower to compensate Lender for Lender's extra costs and expenses caused by the late payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement

between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fourteen (14) days; or (2) if the cure requires more than fourteen (14) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of North Carolina.**

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by ALL BUSINESS ASSETS AND ACCOUNTS RECEIVABLE EITHER PREVIOUSLY OWNED OR ACQUIRED ON OR AFTER THIS DATE, MORE FULLY DESCRIBED IN THAT CERTAIN SECURITY AGREEMENT EXECUTED BY WALL GROUP INDUSTRIES, INC. IN FAVOR OF CAPITAL BANK, N.A. AS LENDER, DATED SEPTEMBER 11, 2015;
ASSIGNMENT OF LIFE INSURANCE POLICY MORE FULLY DESCRIBED IN THAT CERTAIN SECURITY AGREEMENT EXECUTED BY FRANKIE L. BYRD HELD AT PRINCIPAL LIFE INSURANCE COMPANY IN FAVOR OF CAPITAL BANK, N.A. AS LENDER, DATED SEPTEMBER 11, 2015.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: CAPITAL BANK, N.A. P O BOX 18949 RALEIGH, NC 27619.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

WALL GROUP INDUSTRIES, INC.

By:______________________________ (Seal)
FRANKIE L. BYRD, President of WALL GROUP INDUSTRIES, INC.

Signed, acknowledged and delivered in the presence of:

X______________________________
Witness

X______________________________
Witness

**EXHIBIT "3"**

*0007272744501%0220%09112015%WAU3960*

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | 39 | | 34148 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** WALL GROUP INDUSTRIES, INC.
135 EAST MARTIN STREET, SUITE 135
RALEIGH, NC 27601

**Lender:** CAPITAL BANK, N.A.
RALEIGH COMMERCIAL
333 FAYETTEVILLE ST
SUITE 700
RALEIGH, NC 27601

**Guarantor:** FRANKIE L. BYRD
103 STROLLING WAY
DURHAM, NC 27707

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of

this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Additional Requirements. Tax Returns.** As soon as available, but in no event later than one-hundred-twenty (120) days after the fiscal year end for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a Tax Professional satisfactory to the Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty. In addition to the waivers set forth above, Guarantor expressly waives, to the extent permitted by North Carolina law, all of Guarantor's rights under (1) North Carolina General Statutes Sections 26-7 through Section 26-9, or any similar or subsequent laws, (2) North Carolina General Statutes Section 25-3-605 relating to impairment of collateral, or any similar or subsequent law, and (3) North Carolina General Statutes Section 25-9-501 and Section 25-9-504 with respect to the "commercial reasonableness" of any sale of collateral, or any similar or subsequent laws.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes

insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**ADDITIONAL REPORTING REQUIREMENTS.** Guarantor shall deliver to Lender, as soon as available, but in no event later than one-hundred-twenty (120) days after the fiscal year end for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a Tax Professional satisfactory to the Lender, including any and all Schedule K-1's (Form 1065) contained therein, each of which shall be signed and certified by Guarantor to be true, correct and complete copies of such returns as submitted to the Internal Revenue Service. In the event an extension is filed, Guarantor shall deliver a copy of such extension with 30 days of filing.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions.**

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means WALL GROUP INDUSTRIES, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation FRANKIE L. BYRD, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means CAPITAL BANK, N.A., its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED SEPTEMBER 11, 2015.**

**THIS GUARANTY IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS GUARANTY IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**GUARANTOR:**

X [signature] (Seal)
FRANKIE L. BYRD

**Signed, acknowledged and delivered in the presence of:**

X________________________
Witness

X________________________
Witness

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF North Carolina )
) SS
COUNTY OF Wake )

I, Amanda Jones, a Notary Public for said County and State, certify that FRANKIE L. BYRD personally came before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and Notarial Seal this the 11 day of September, 2015.

[signature: Amanda Jones]
Notary Public

My Commission Expires:
2/13/2018

( Affix Notarial Seal Here )

AMANDA JONES NOTARY MY COMMISSION EXPIRES 2/13/2018 PUBLIC WAKE COUNTY, NC

**EXHIBIT "4"**

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $800,000.00 | 09-11-2015 | 10-05-2016 | 7272744501 | 39 | WAU3960 | 34148 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** WALL GROUP INDUSTRIES, INC.
135 EAST MARTIN STREET, SUITE 135
RALEIGH, NC 27601

**Lender:** CAPITAL BANK, N.A.
RALEIGH COMMERCIAL
333 FAYETTEVILLE ST
SUITE 700
RALEIGH, NC 27601

**THIS COMMERCIAL SECURITY AGREEMENT dated September 11, 2015, is made and executed between WALL GROUP INDUSTRIES, INC. ("Grantor") and CAPITAL BANK, N.A. ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Business Assets and Accounts Receivable whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds.)**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, reasonable attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such

information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fourteen (14) days; or (2) if the cure requires more than fourteen (14) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the North Carolina Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of North Carolina.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means WALL GROUP INDUSTRIES, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means WALL GROUP INDUSTRIES, INC..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Agreement together with all interest thereon.

**Lender.** The word "Lender" means CAPITAL BANK, N.A., its successors and assigns.

**Note.** The word "Note" means the Note dated September 11, 2015 and executed by WALL GROUP INDUSTRIES, INC. in the principal amount of $800,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 11, 2015.**

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

GRANTOR:

WALL GROUP INDUSTRIES, INC.

By:______________________________(Seal)
FRANKIE L. BYRD, President of WALL GROUP INDUSTRIES, INC.

Signed, acknowledged and delivered in the presence of:

X______________________________
Witness

X______________________________
Witness

LaserPro, Ver. 15.1.0.023 Copr. D+H USA Corporation 1997, 2015. All Rights Reserved. - NC F:\CFIROOT\CFI\LPL\E40.FC TR-50858 PR-6

**EXHIBIT "5"**

[redacted]

File Number: 20150089387E
Date Filed: 9/17/2015 1:16:00 PM
Elaine F. Marshall
NC Secretary of State

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Gisella Melendez**

B. E-MAIL CONTACT AT FILER (optional)
**efiling@wolterskluwer.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**CT Lien Solutions**
**P.O. Box 29071**
**Glendale, CA 91209-9071**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
**WALL GROUP INDUSTRIES, INC.**

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 135 EAST MARTIN STREET, SUITE 135 | RALEIGH | NC | 27601 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
**CAPITAL BANK, N.A.**

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 333 FAYETTEVILLE ST | RALEIGH | NC | 27601 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**All Business Assets and Accounts Receivable whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds.)**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**NC-0-49994421-50486035**

**EXHIBIT "6"**

# Stock Purchase Agreement
# Wall Group Industries, Inc.

This Stock Purchase Agreement (hereinafter referred to as "Agreement") is made as of ___ day of January, 2017, by and between, as party of the first part, MICHAEL D. OLANDER, JR., an individual resident of Raleigh, North Carolina (hereinafter referred to as the "Buyer"), and as the parties of the second part, FRANK LEE BYRD, an individual resident of Raleigh, North Carolina (hereinafter referred to as "Seller"), and WALL GROUP INDUSTRIES, INC., a North Carolina corporation (hereinafter referred to as "Company").

## RECITALS

1. Company is in the business of commercial construction specializing in dry-wall, framing, and insulation subcontract work, with existing and past contracts with the federal government, state government, museums, and large residential apartment projects;

2. Company is currently in a stage of expansion and is in need of capital liquidity to fund its upcoming jobs;

3. Company has One Hundred Thousand (100,000) issued and outstanding common shares all of one class (hereinafter referred to as "Shares");

4. Seller is the current beneficial owner of 75,000 Shares and Buyer is the current beneficial owner of 25,000 Shares.

5. Seller desires to sell, and Buyer desires to purchase, 15,000 Shares for the consideration and on the terms set forth in this Agreement (hereinafter referred to as the "Purchased Shares").

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

**1. DEFINITIONS.**

**1.1** **"Closing"**--as defined in Section 2.3.

**1.2** **"Closing Date"**--the date of this Agreement.

**1.3** **"Encumbrance"**--any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

**1.4** **"Governmental Body"** -- any federal, state or local government, or political subdivision thereof, or any governmental authority, agency or commission.

**1.5** **"Organizational Documents"**--(a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

**1.6** **"Person"** -- any individual, firm, proprietorship, partnership, corporation, limited liability company, limited partnership, association, joint stock company, trust, joint venture, unincorporated organization, Governmental Body or any other type of entity.

1.7 **"Proceeding"**--any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

## 2. SALE AND TRANSFER OF PURCHASED SHARES; CLOSING.

### 2.1 PURCHASED SHARES.

Subject to the terms and conditions of this Agreement, at the Closing, Seller will sell and transfer the Purchased Shares (representing ten percent of the Shares) to Buyer, and Buyer will purchase the Purchased Shares from Seller, free and clear of all Encumbrances.

### 2.2 PURCHASE PRICE.

The consideration for the Purchased Shares will be (a) Buyer's loan of funds to the Company and (b) Buyer's assistance to the Company in obtaining additional credit if necessary.

### 2.3 CLOSING.

The purchase and sale (hereinafter referred to as the "Closing") provided for in this Agreement will take place via the electronic exchange of documents and signature pages on the Closing Date.

### 2.4 CLOSING OBLIGATIONS

At the Closing, Seller will deliver to Buyer a Certificate representing the Purchased Shares, duly endorsed (or accompanied by duly executed stock powers).

## 3. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows:

### 3.1 ORGANIZATION AND GOOD STANDING.

(a) The Company is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under this Agreement.

(b) Seller has delivered to Buyer copies of the Organizational Documents of the Company, as currently in effect.

### 3.2 AUTHORITY; NO CONFLICT.

(a) This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms. Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and to perform his obligations under this Agreement.

(b) Neither the execution and delivery of this Agreement nor the consummation or performance of this Agreement will, directly or indirectly (with or without notice or lapse of time):

(i) contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of the Company, or (B) any resolution adopted by the board of directors or the stockholders of the Company;

(ii) contravene, conflict with, or result in a violation of, or give any Governmental Body

or other Person the right to challenge this Agreement or to exercise any remedy or obtain any relief under, any legal requirement or any order to which the Company or Seller, or any of the assets owned or used by the Company, may be subject;

(iii) contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any governmental authorization that is held by the Company or that otherwise relates to the business of, or any of the assets owned or used by, the Company;

(iv) cause Buyer or the Company to become subject to, or to become liable for the payment of, any tax;

(v) cause any of the assets owned by the Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(vi) contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any applicable contract of the Company; or

(vii) result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Company.

(c) Seller and Company will not be required to give any notice to or obtain any consent from any Person or Governmental Body in connection with the execution and delivery of this Agreement or the consummation or performance of this Agreement.

### 3.3 CAPITALIZATION

The authorized equity securities of the Company consist of ONE HUNDRED THOUSAND (100,000) shares of common stock, no par value per share, of which ONE HUNDRED THOUSAND (100,000) shares are issued and outstanding and constitute the Shares. Immediately prior to the Closing, Seller is the record and beneficial owner and holder of 75,000 Shares, including the Purchased Shares, free and clear of all Encumbrances, and Buyer is the record and beneficial owner and holder of 25,000 Shares. No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of the Company. All of the Purchased Shares have been duly authorized and validly issued and are fully paid and nonassessable. There are no contracts relating to the issuance, sale, or transfer of any Purchased Shares or any other equity securities of the Company. None of the Purchased Shares were issued in violation of any applicable securities law or any other legal requirement. The Company does not own and has no contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

### 3.4 TAXES

There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, county, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year. For U.S. federal income tax purposes, the Company has been classified as an S corporation within the meaning of Sections 1361 and 1362 of the Code at all times since its incorporation.

**3.5 LITIGATION**

There is no Proceeding pending or, to the knowledge of Seller, threatened against the Company or affecting its assets and there is no governmental order outstanding against the Company or relating to any of its assets, properties or business.

**3.6 COMPLIANCE WITH LAWS**

The Company is not in breach or violation of, or default under, and has not received notice of any breach or violation of, or default under, and has not been in breach or violation of, or default under any applicable law with respect to the operation of its business.

**3.7 BROKERS OR FINDERS**

Seller and their agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

**4. REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as follows:

**4.1 AUTHORITY; NO CONFLICT**

(a) This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Buyer has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and to perform his obligations under this Agreement.

(b) Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of this Agreement by Buyer will give any Person the right to prevent, delay, or otherwise interfere with this Agreement pursuant to:

(i) any legal requirement or order to which Buyer may be subject; or

(ii) any contract to which Buyer is a party or by which Buyer may be bound.

(c) Buyer is not and will not be required to obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of this Agreement.

**4.2 INVESTMENT INTENT**

Buyer is acquiring the Purchased Shares for his own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act of 1933, as amended.

**4.3 CERTAIN PROCEEDINGS**

There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, this Agreement. To Buyer's knowledge, no such proceeding has been threatened.

**4.4 BROKERS OR FINDERS**

Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise,

for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

## 5. GENERAL PROVISIONS

### 5.1 EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement, including all fees and expenses of agents, representatives, counsel, and accountants.

### 5.2 NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

**Seller:**

Attention: Gregory S. Connor
Connor Law Group, PLLC
2501 Blue Ridge Road, Suite 250
Raleigh, North Carolina 27607
Facsimile No.: 919-237-9221

**Buyer:**

Michael D. Olander, Jr.
135 E. Martin Street
Suite 201
Raleigh NC 27601
Email: molander@o2fitnessclubs.com

### 5.3 JURISDICTION; SERVICE OF PROCESS.

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of North Carolina, County of Wake, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of North Carolina, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

### 5.4 FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

## 5.5 WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

## 5.6 ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

## 5.7 ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

## 5.8 SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## 5.9 SECTION HEADINGS, CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

## 5.10 GOVERNING LAW

This Agreement will be governed by the laws of the State of North Carolina without regard to conflicts of laws principles.

**5.11 COUNTERPARTS**

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

(Signatures appear on following page)

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**Buyer:**

By:________________________________
MICHAEL D. OLANDER, JR.

**Seller:**

By: ________________________________
FRANK LEE BYRD

**Company:**

By: ________________________________
FRANK LEE BYRD, President

elliott davis
decosimo

To Management
Wall Group Industries, Inc.
Durham, NC 27707

This letter is to confirm our acceptance and our understanding of the terms and objectives of our engagement and the nature and limitations of the service we will provide.

We will perform the following services:

1. We will provide you with the following bookkeeping services:

   - Inform you of adjustments we identify and request that you make correcting entries directly into your general ledger.
   - Record depreciation

Our bookkeeping services will cover the nine months ended September 30, 2016.

2. We will prepare the financial statements of Wall Group Industries, Inc. ("the Company"), which comprise the balance sheet as of September 30, 2016 and the related statements of income and changes in stockholders' equity for the nine months then ended, and perform a compilation engagement with respect to those financial statements. These financial statements will not include statements of cash flows and related notes to the financial statements as required by accounting principles generally accepted in the United States of America.

We will assist your bookkeeper in adjusting the books of accounts with the objective that he (she) will be able to prepare a working trial balance from which financial statements can be prepared. Your bookkeeper will provide us with a detailed trial balance and any supporting schedules we require.

**Our Responsibilities**

The objective of our engagement is to-

- Prepare financial statements in accordance with accounting principles generally accepted in the United States of America based on information provided by you and

- Apply accounting and financial reporting expertise to assist you in the presentation of financial statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

We will conduct our compilation engagement in accordance with the Statements on Standards for Accounting and Review Services (SSARS) promulgated by the Accounting and Review Services Committee of the AICPA and comply with applicable professional standards, including the AICPA's Code of Professional Conduct, and its ethical principles of integrity, objectivity, professional competence, and due care, when performing the bookkeeping services, preparing the financial statements, and performing the compilation engagement.

We are not required to, and will not, verify the accuracy or completeness of the information you will provide to us for the engagement or otherwise gather evidence for the purpose of expressing an opinion or a conclusion. Accordingly, we will not express an opinion or a conclusion nor provide any assurance on the financial statements.

Our engagement cannot be relied upon to identify or disclose any financial statement misstatements, including those caused by fraud or error, or to identify or disclose any wrongdoing within the entity or noncompliance with laws and regulations.

We, in our sole professional judgment, reserve the right to refuse to perform any procedure or take any action that could be construed as assuming management responsibilities.

**Your Responsibilities**

The engagement to be performed is conducted on the basis that you acknowledge and understand that our role is to prepare financial statements in accordance with accounting principles generally accepted in the United States of America and assist you in the presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America. You have the following overall responsibilities that are fundamental to our undertaking the engagement in accordance with SSARS:

1. The selection of accounting principles generally accepted in the United States of America as the financial reporting framework to be applied in the preparation of the financial statements.

2. The preparation and fair presentation of financial statements in accordance with accounting principles generally accepted in the United States of America and the inclusion of all informative disclosures that are appropriate for accounting principles generally accepted in the United States of America, if applicable.

3. The design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of the financial statements.

4. The prevention and detection of fraud.

5. To ensure that the Company complies with the laws and regulations applicable to its activities.

6. The accuracy and completeness of the records, documents, explanations, and other information, including significant judgments, you provide to us for the engagement.

7. To provide us with-

   - Access to all information of which you are aware is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters.

   - Additional information that we may request from you for the purpose of the compilation engagement.

   - Unrestricted access to persons within the Company of whom we determine it necessary to make inquiries.

You are also responsible for all management decisions and responsibilities and for designating an individual with suitable skills, knowledge, and experience to oversee our bookkeeping services and the preparation of your financial statements. You are responsible for evaluating the adequacy and results of the services performed and accepting responsibility for such services.

If, in connection with our audit, you request us to perform accounting services necessary for the preparation of the financial statements (such as computing the provision for income taxes, drafting the financial statements, and calculating depreciation for the Company's fixed assets, etc.), you agree to designate an appropriate individual to oversee the services, make all management decisions involved in those services, evaluate the adequacy and results of the services, and accept responsibility for the results of the services.

**Our Report**

As part of our engagement, we will issue a report that will state that we did not audit or review the financial statements and that, accordingly, we do not express an opinion, a conclusion, nor provide any assurance on them. If, for any reason, we are unable to complete the compilation of your financial statements, we will not issue a report on such statements as a result of this engagement.

You agree to include our accountant's compilation report in any document containing financial statements that indicates that we have performed a compilation engagement on such financial statements and, prior to the inclusion of the report, to ask our permission to do so.

**Other Relevant Information**

James Hayne is the engagement partner and is responsible for supervising the engagement and signing the report or authorizing another individual to sign it. Our fees are based on the time required by the individuals assigned to the engagement, plus direct expenses. Interim billings will be submitted as work progresses and as expenses are incurred. Billings are due upon submission.

You agree to hold us harmless and to release, indemnify, and defend us from any liability or costs, including attorney's fees, resulting from management's knowing misrepresentations to us.

We appreciate the opportunity to be of service to you and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you acknowledge and agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Sincerely,

**Elliott Davis Decosimo, PLLC**

James H. Hayne
Shareholder

Acknowledged: Wall Group Industries, Inc.

President

2.17.17
Date

**EXHIBIT "7"**

SOSID: 1611727
Date Filed: 7/21/2017 1:51:00 PM
Elaine F. Marshall
North Carolina Secretary of State
C2017 200 00430

*State of North Carolina*
*Department of the Secretary of State*

# Limited Liability Company
## ARTICLES OF ORGANIZATION

Pursuant to §57D-2-20 of the General Statutes of North Carolina, the undersigned does hereby submit these Articles of Organization for the purpose of forming a limited liability company.

1. The name of the limited liability company is: FFD, LLC
(See Item 1of the Instructions for appropriate entity designation)

2. The name and address of each person executing these articles of organization is as follows: (State whether each person is executing these articles of organization in the capacity of a member, organizer or both.
**Note: This document must be signed by all persons listed.)**

| Name | Address | Capacity |
|---|---|---|
| Len Morton | 135 E Martin St, Ste 201, Raleigh NC 27601 | Organizer |
| | | |
| | | |

3. The name of the initial registered agent is: Incorp Services, Inc.

4. The street address and county of the initial registered agent office of the limited liability company is:

Number and Street 176 Mine Lake Court, Ste 100

City Raleigh State: NC Zip Code: 27615 County: Wake

5. The mailing address, if different from the street address, of the initial registered agent office is:

Number and Street ______

City ______ State: NC Zip Code: ______ County: ______

6. Principal office information: (Select either a or b.)

a. ■ The limited liability company has a principal office.

The principal office telephone number: 919-532-0702

The street address and county of the principal office of the limited liability company is:

Number and Street: 135 E Martin Street, Ste 201

City: Raleigh State: NC Zip Code: 27601 County: Wake

The mailing address, if different from the street address, of the principal office of the company is:

Number and Street: ______________________

City: ____________ State: ______ Zip Code: ________ County: ____________

b. ☐ The limited liability company does not have a principal office.

7. Any other provisions which the limited liability company elects to include (e.g., the purpose of the entity) are attached.

8. **(Optional):** Listing of Company Officials (See instructions on the importance of listing the company officials in the creation document.

| Name | Title | Business Address |
|---|---|---|
| | | |
| | | |

9. **(Optional):** Please provide a business e-mail address: ______________________
The Secretary of State's Office will e-mail the business automatically at the address provided above at no cost when a document is filed. The e-mail provided will not be viewable on the website. For more information on why this service is offered, please see the instructions for this document.

10. These articles will be effective upon filing, unless a future date is specified:

______________________

This is the 19 day of July, 20 17.

[signature]
Signature

Len Morton, Organizer
Type or Print Name and Title

---

The below space to be used if more than one organizer or member is listed in Item #2 above.

______________________ ______________________

Signature Signature

Type and Print Name and Title Type and Print Name and Title

**NOTE:**
1. Filing fee is $125. This document must be filed with the Secretary of State.

**EXHIBIT "8"**

# ALLONGE

Capital Bank Loan No.: 7272744501

This ALLONGE is attached to and shall become a part of that certain Commercial Promissory Note in favor of CAPITAL BANK, N.A. in the original principal amount of EIGHT HUNDRED THOUSAND and NO/100 DOLLARS ($800,000.00), executed and delivered by WALL GROUP INDUSTRIES, INC. ("Borrower") dated September 11, 2015, as the same may have been renewed, assigned, amended, supplemented, restated or modified.

Pay to the order of FFD, LLC **WITHOUT RECOURSE, WARRANTY, OR REPRESENTATION, EXCEPT AS EXPRESSLY PROVIDED IN THAT CERTAIN NOTE PURCHASE AND SALE AGREEMENT BETWEEN FFD, LLC AND CAPITAL BANK CORPORATION DATED AS OF JULY 31, 2017.**

Effective as of July 31, 2017.

**CAPITAL BANK CORPORATION**, a North Carolina banking corporation (successor by conversion to Capital Bank, N.A.)

By: A. Steele Hall Jr.

Name: A. Steele Hall Jr.

Title: Vice President

**EXHIBIT "9"**

[redacted]

File Number: 20170083860G
Date Filed: 8/11/2017 4:51:00 PM
Elaine F. Marshall
NC Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Chapman, Libby

B. E-MAIL CONTACT AT FILER (optional)
libbychapman@parkerpoe.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Parker Poe Adams & Bernstein LLP
401 S Tryon St Ste 3000
Charlotte, NC 28202-1942

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20150089387E

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME
Capital Bank, N.A.

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME
FFD, LLC

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 135 E. Martin Street, Suite 201 | Raleigh | NC | 27601 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
Capital Bank, N.A.

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:
154788

# EXHIBIT "10"

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Davidson and Jones Construction Company
Attn: Mark A. Striebel, President and Registered Agent
1207 Front Street
Raleigh, NC 27609

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)

Elaine F. Marshall
Secretary

North Carolina
DEPARTMENT OF THE SECRETARY OF STATE
PO Box 29622 Raleigh,NC 27626-0622 (919)814-5400

Account Login
Create Site Account

**UCC Filing Chain: 20150089387E**

---

20150089387E

**Filing Date:** 9/17/2015
**Filing Type:** Initial
**Lapse Date:** 9/17/2020
**Page Count:** 1

**Debtors:**

**WALL GROUP INDUSTRIES, INC.**
135 EAST MARTIN STREET, SUITE 135
RALEIGH, NC 27601 USA

**Secured Parties:**

**CAPITAL BANK, N.A.**
333 FAYETTEVILLE ST
RALEIGH, NC 27601 USA

---

20170083860G

**Filing Date:** 8/11/2017
**Filing Type:** Assignment
**Page Count:** 1

**Secured Parties:**

**FFD, LLC**
135 E. Martin Street, Suite 201
Raleigh, NC 27601 USA

File Number: 20150089387E
Date Filed: 9/17/2015 1:16:00 PM
Elaine F. Marshall
NC Secretary of State

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Gisella Melendez

B. E-MAIL CONTACT AT FILER (optional)
efiling@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

CT Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: WALL GROUP INDUSTRIES, INC.

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 135 EAST MARTIN STREET, SUITE 135 | RALEIGH | NC | 27601 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME:

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: CAPITAL BANK, N.A.

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 333 FAYETTEVILLE ST | RALEIGH | NC | 27601 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All Business Assets and Accounts Receivable whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds.)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
NC-0-49994421-50486035

[redacted]

File Number: 20170083860G
Date Filed: 8/11/2017 4:51:00 PM
Elaine F. Marshall
NC Secretary of State

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Chapman, Libby

B. E-MAIL CONTACT AT FILER (optional)
libbychapman@parkerpoe.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Parker Poe Adams & Bernstein LLP
401 S Tryon St Ste 3000
Charlotte, NC 28202-1942

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
20150089387E

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME
Capital Bank, N.A.

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME
FFD, LLC

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 135 E. Martin Street, Suite 201 | Raleigh | NC | 27601 | USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
Capital Bank, N.A.

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:
154788

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Jane Pleasants
VP, Supply Chain
Duke University
1121 Hospital South
Durham, NC 27708

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company, and that such debt may relate to work performed by the Company at the Nasher Museum of Art. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)
Meg G. Richards, Duke University Associate University Counsel

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Gilbane Building Company
Attn: Michael M. Costello, Treasurer
7 Jackson Walkway
Providence, RI 02903

Gilbane Building Company
Attn: CT Corporation System, Registered Agent
160 Mine Lake Ct, Suite 200
Raleigh, NC 27615-6417

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Gilbane/Grunley Joint Venture
Attn: Accounts Payable
15020 Shady Grove Rd.
Rockville, MD 20850-3364

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Grunley Construction Company, Inc.
Attn: Adam Grunley
15020 Shady Grove Rd., Suite 500
Rockville, MD 20850-3390

Grunley Construction Company, Inc.
Attn: Incorp Services, Inc., Registered Agent
176 Mine Lake Ct., Suite 100
Raleigh, NC 27615-6417

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)

Parker Poe

**Matthew P. Weiner**
*Partner*
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

State of North Carolina
State Property Office
Attn: Accounts Payable
116 W. Jones St.
Raleigh, NC 27603-1300

North Carolina Department of Natural and Cultural Resources
109 E. Jones Street
Attn: Accounts Payable
Mail Service Center 4601
Raleigh, NC 27601

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company, and that such debt may relate to work performed by the Company at the NC Museum of Art. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD,

LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)

Parker Poe

**Matthew P. Weiner**
***Partner***
Telephone: 919.835.4502
Direct Fax: 919.834.4564
mattweiner@parkerpoe.com

Atlanta, GA
Charleston, SC
Charlotte, NC
Columbia, SC
Greenville, SC
Raleigh, NC
Spartanburg, SC

October 2, 2017

**VIA FEDEX**

Wolk360 Architecture, PLLC
Attn: Johnathan Wolk, Registered Agent
1010 Nicholwood Drive #203
Raleigh, NC 27605

Re: Wall Group Industries, Inc. (the "Company")

Notice to Account Debtors Pursuant to Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1)

To Whom It May Concern:

This firm represents FFD, LLC, a North Carolina limited liability company ("FFD") with respect to certain obligations owed by the Company to FFD. These obligations are secured by a Commercial Security Agreement dated September 11, 2015, as subsequently assigned to FFD (the "Security Agreement"), which grants FFD a security interest in, among other things, all of the Company's accounts receivable. This security interest is perfected by a UCC-1 Financing Statement in favor of FFD filed with the Secretary of State of North Carolina. A copy of the original UCC-1 Financing Statement and its assignment to FFD are enclosed.

FFD is informed and believes that you may owe a debt to the Company. This letter notifies you that, pursuant to the Security Agreement and N.C. Gen. Stat. § 25-9-607(a)(1), FFD is exercising its security interest in the Company's accounts receivable. FFD requests that you (1) make all checks or other payments that were payable to the Company now payable to FFD, LLC, and (2) immediately send all such checks or other payments to FFD at the following address:

FFD, LLC
Attention: Len Morton
135 E Martin St., Suite 201
Raleigh, NC 27601

Any payment you may make to the Company after your receipt of this letter will not reduce or discharge your obligation to pay such accounts receivable directly to FFD. N.C. Gen. Stat. § 25-9-406 provides that "[a]fter receipt of the notification, the account debtor may discharge its obligation by paying the assignee [FFD] **and may not discharge the obligation by paying the assignor [Company]**."

Please contact me immediately if you have any questions.

Sincerely,

Matthew P. Weiner

Enclosure

cc: Wall Group Industries, Inc.
c/o Jim White, Esq. (via e-mail)